SARAH L. GUTHRIE, Respondent, v. CHARLES W. GUTHRIE, Appellant.

St. Louis Court of Appeals, May 31, 1887.

1. DIVORCE—CONDONATION.—A condonation of past matrimonial offences is conditioned upon the future good behavior of the offender, and a repetition of the offences revives the right to make the former offences a ground for divorce.

2. ——— EVIDENCE OF CONDONATION.—The wife having separated from the husband for causes which would entitle her to a divorce, her return to him for the sole purpose of nursing him while he is suffering from a supposed mortal ailment, is not necessarily a condonation of past offences, even though she remain with him thus for several years.

APPEAL from the St. Louis Circuit Court, W. H. HORNER, Judge.

*Affirmed.*

JOHN O'GRADY and ERNEST C. DODGE, for the appellant: The evidence shows that the plaintiff fully condoned all acts upon which she seeks to obtain a divorce long prior to the institution of this suit; and that, after condonation, the defendant commited no act which could be construed into a revival of the causes of divorce mentioned, and set forth, in the petition. *Twyman v. Twyman*, 27 Mo. 383. The defence of condonation is equally applicable to cruelty and to other causes for divorce. *Gardner v. Gardner*, 2 Gray, 434, 441;

*Sullivan v. Sullivan*, 34 Ind. 368, 369; *Phillips v. Phillips*, 27 Wis. 252, 253.

E. P. JOHNSON, for the respondent: The conduct of the appellant was such as to authorize a divorce, even under a statute requiring extreme and repeated cruelty for that purpose. *Sharp v. Sharp*, 116 Ill. 509; Bishop on Marriage and Divorce, sects. 729 to 733*b*. And certainly under our more liberal statute. *Clarkson v. Clarkson*, 22 Mo. App. 236; *Hooper v. Hooper*, 19 Mo. 357. Condonation is always conditional on good behavior, and bad conduct revives the condoned offence. *Wagner v. Wagner*, 6 Mo. App. 572, 573; *Twyman v. Twyman*, 27 Mo. 383.

THOMPSON, J., delivered the opinion of the court.

The petition states that the plaintiff and the defendant were married on the third day of March, 1874, and continued to live together as husband and wife until the first day of June, 1877, or thereabouts. It charges that, during this period, the defendant (1) for the space of one year, and further, was addicted to habitual drunkenness; (2) that he, "for the space of one year, and after said marriage, and further, offered such indignities to the plaintiff, during the said marriage, as to render her condition intolerable, in this: by assaulting and beating her, and threatening to kill her, and failing to provide for her support."

The answer admits the marriage, and denies each and every other allegation of the petition. It sets up that, since July, 1880, the defendant has been, and still is, paralyzed, physically helpless, and wholly without power of locomotion; that, until the twentieth of July, 1883, the plaintiff lived with him as his wife; that, on the last named day, while he was in bed and wholly helpless, she, without cause or provocation, deserted and forsook him, since which time she has not returned to him, but has remained away from him, though he has

frequently appealed to her by letter to return to him; that he has never failed, or refused, to provide for her, but, on the contrary, has frequently and repeatedly besought her to return to him, that he might provide for her wants and the wants of their child, but that she has refused to do so. The answer also states that, for three years subsequent to the times mentioned in the petition, she lived with him, during all of which time he faithfully demeaned himself toward her as an affectionate husband, and alleges that she forsook and deserted him as aforesaid, because of his physical afflictions, and because of her dislike to his relatives, and not because of any misconduct on his part; and he pleads this three years' cohabitation as a condonation of any previous offences which he may have committed.

The circuit court decreed a divorce, and awarded the custody of the only child of the marriage, a girl about six years old, to the plaintiff, in accordance with the prayer of her petition.

It is perceived that the petition for divorce is grounded upon two of the heads of the statute (Rev. Stat., sect. 2174): (1) Habitual drunkenness for the space of one year; (2) indignities rendering her condition intolerable. If the plaintiff has made out her case under either of these heads, she is entitled to a divorce, unless she has condoned the defendant's offences, as set up in his answer. The record is voluminous, but has been gone over with care. We are of opinion that the plaintiff has given evidence which entitles her to a divorce on either of the above grounds, and that this evidence has not been overcome by counter evidence adduced on behalf of the defendant. We are further of opinion that the cohabitation of three years, which the defendant sets up as a condonation of his previous offences, was not such a condonation in contemplation of law. We shall proceed briefly to state our reasons for these conclusions, but we do not think it necessary to rehearse the testimony in much minuteness of detail.

As admitted in the pleadings, the parties were married in 1874. As early as 1876, the testimony leaves no room for doubt, the defendant had become so addicted to the use of intoxicants as to be regarded as an habitual drunkard within the meaning of the above statute. His habits of intoxication are admitted by himself and his witnesses, though an attempt is made to make it appear that they were not as bad as the plaintiff's evidence would indicate. The evidence furnished by the plaintiff and her witnesses was to the effect that he spent all, or nearly all, of his earnings in procuring intoxicating drink; that he was drunk half his time or more; that his life was characterized by a succession of drunken sprees; and that, finally, in one of these periods of drunkenness, he fell down a stair at his mother's residence, and received a physical injury, which will be hereafter spoken of.

The charge of indignities, rendering the condition of the plaintiff intolerable, with the specifications that the indignities consisted in his assaulting and beating the plaintiff, threatening to kill her, and failing to provide for her support, are, also, well sustained by the evidence. According to the plaintiff's testimony, he often slapped her. On one occasion, in 1878, while she was living with her mother, he threatened to cut her heart out and throw it before her face, unless she would go with him. He was intoxicated at the time. Doctor Bates, the family physician, assisted in holding him off from her, and in conducting him to the sidewalk. On another occasion, in 1880, while she was living with her mother, he went to her mother's house, intoxicated, and asked her to take a walk with him, which she refused; whereupon he threatened to kill her. He went home, and, afterwards, started down stairs, apparently for the purpose of returning to the house of the plaintiff's mother, when he fell down stairs and received a severe injury of the spine, which paralyzed his legs and arms. During the entire period of their married life, the aggregate

amount which he contributed to the support of his family was so little, according to the concurrence of the testimony, as scarcely to deserve the name. On one occasion, in a drunken spree, his wife having temporarily left their home to go to the house of her mother, he sold out all their furniture, which was very little, and, with the proceeds, started off. He traveled on foot, until he reached a place in Ohio, where he found himself with his money exhausted, and unable to proceed further or to return. He telegraphed to a relative for money, and with it returned, arriving in town bare-footed and almost naked, so that it required an explanation to prevent his arrest by the police. He was unable, by reason of his habits, to retain a permanent situation, although he seems to have been a good upholsterer. His temper was exceedingly violent. Although there is no specification in the petition of abusive language used by him toward the plaintiff, except the threat to kill her, the evidence abounds in statements, admitted without objection, that he was in the habit of using violent and abusive language toward her during his spells of intoxication, and he admits this himself. In one of his letters to her, put in evidence by consent of the parties, he used this language ; he refers to his "mean, irritable temper," and says : "Oh, how I wish I had lived different ! I might now have a much pleasanter home than this Devil's rattle-box, and have my family about me. * * * You can not imagine how lonesome I feel not to have you occasionally near me, even though it be to curse at you." In short, the evidence, throughout, indicates that the defendant, though possessed of unquestioned ability, as his letters and testimony show, and the master of a good trade, was unable, by reason of his ungovernable infirmities of appetite and temper, either to afford a certain support for his wife, or to treat her as a husband, in the lowest walks of life, is expected and required to treat his wife. The plaintiff, on the other hand, appears to be a lady of refinement, and it is admitted that she is of

irreproachable character.   No attempt is made at re-
crimination ; and, so far as her conduct is concerned,
her case is absolutely clear, unless, by her conduct,
which will now be stated, she has condoned his previous
offences.

When he fell down the stairway, and received the
injuries already spoken of, an eminent surgeon was
called in, who, after an examination, gave it as his
opinion that he could nót live more than ten days.
His sister communicated these facts to the plaintiff, who
was, at the time, and had been, for several months pre-
viously, living apart from him, at her mother's house,
with their child.   The plaintiff conceived it to be her
duty to go to the house of her step-mother and nurse
her husband.   This she did.   Though injured to such
an extent that he had neither the use of his hands nor
his legs, and was, for a long period, obliged to lie on a
water bed, and received his food through a tube inserted
in his mouth, his vitality was such that he defeated the
prediction of the surgeon, and lived.   Mrs. Guthrie re-
mained with him, and nursed him, continuously, pa-
tiently, and lovingly, for a period of about three years.
During this time he exhibited, so far as a man in his
physical condition might, the same infirmities of temper
toward her which he had exhibited in health.   He abused
her, frequently, and her evidence is to the effect that,
on one occasion, he threw a spit-box at her ; another
time, a tumbler ; and habitually cursed her ; though
these attempted acts of violence are denied by him.   In
his testimony, which is ably put together and rehearsed,
and which shows that he is possessed of an intellect
worthy of a better lot, he admits, to some extent, these
exhibitions of infirm temper, but ascribes them to the
constant use of morphine, which his condition ren-
dered necessary, and to the deprivation of the alcoholic
stimulants to which he had been previously accustomed.
These circumstances may have contributed, and, no
doubt, did contribute, to produce this result ; but the

fact that the fits of ungovernable temper were character-
istics which he exhibited in health, precludes the con-
clusion that they were the mere results of disease, and
opiates used as medicine.

The evidence is conflicting as to the circumstances
under which Mrs. Guthrie finally abandoned him, while
thus sick at his mother's house, and returned to the resi-
dence of her own mother. During this period of about
three years their child had lived with her mother. She
did not get on very well, it seems, with Mr. Guthrie's
mother. He began to mend ; and we . incline to think
that, when she saw that he was about to recover ; that
her position of the nurse of a helpless paralytic would
soon become that of the wife of a dangerous man of
ungoverned appetite and temper, with whom she had
not been able to live while he was in health, the
determination to return to her mother slowly grew
upon her, until finally she took that step. It is very
difficult to say, under the circumstances of the case,
that she was not justified in taking it. We do not
attach much importance to the contention of her counsel
that, during these three years, she had waited upon him
*as a nurse* and had not cohabited with him *as a wife.*
Cohabitation as a wife with a prostrate paralytic would,
of course, be impossible, in the ordinary and full sense
of that expression ; and there is no evidence that any
such cohabitation took place, though such evidence
would not, perhaps, have been admissible against the ob-
jection of the plaintiff. On the other hand, it is possible
that, if the matter were very material, she would not be
heard to say, on grounds of morality and decency, that
she had lived with him and slept in the same room with
him for three years, as his nurse, and not as his wife.
During this period she slept on a lounge in the same
room with him, where she could be near him to wait on
him during the night. She admitted that on one occas-
ion she had lain on the bed on his arm. Without going
further into these details, we take it to be a fair infer-

ence, from the evidence, that, living apart from him, because her situation when living with him was intolerable, she returned to him when he received this hurt, which threatened to end in his speedy death, out of a feeling of sympathy and under a sense of duty ; that she returned, not for the purpose of cohabiting with a well man capable of injuring her, but for the purpose of nursing a helpless invalid, in all probability, about to die. Even if his conduct during the three years in which she remained with him and nursed him had been, in all respects, kind and exemplary, it might be difficult to say that such a return was a condonation of his past offences, and it might be regarded a harsh rule of law that would convert such a sacrifice on her part into a deprivation of her legal rights.

But it is settled and familiar law that that cohabitation which will condone past matrimonial offences is conditioned upon future good behavior of the spouse whose offences are condoned, and that when, after the condonation, the offences are repeated, the right to make them a ground of divorce revives. *Twyman v. Twyman*, 27 Mo. 383 ; *Wagner v. Wagner*, 6 Mo. App. 573. An eminent writer on the law of divorce, speaking upon this question, uses the following language : "Special caution is necessary in applying the rules of condonation to cruelty. Not their letter, but their spirit, should be the guide. We are to consider, when asked to infer condonation from subsequent cohabitation, the peculiar nature of the offence of cruelty, as generally witnessed, developing itself by degrees, and so slowly as seldom to reveal, even to the sufferer, the precise line between the endurable and the unendurable ; the difficulty which the wife experiences in making up her mind, in an hour or a day, whether she can longer bear her burden ; and that, often, she can not know certainly and at once whether or not she is in bodily peril, which is the true criterion of legal cruelty, and that, while in suspense, she must continue to cohabit ; and,

in connection with these universal aspects, whatever is special, bearing one way or the other in the particular case." 2 Bish. Mar. & Div., sect. 51. These observations, made with reference to cases where the ground of divorce is cruelty, and the defence is condonation, must equally apply to a case like the present, where the ground of divorce is indignities rendering the condition of the wife intolerable, and the same defence is set up. Whatever is *special* in the case must be carefully attended to, and in the present case there is this special circumstance; that the wife returned to the husband, not to cohabit with him in health, but, leaving her child at her mother's house, to nurse him in sickness. The patient endurance of ill treatment is not only no bar to the wife's complaint, but creates no presumption against its truth. 2 Bish. Mar. & Div., sect. 52; compare the following authorities: *D'Aguilar v. D'Aguilar*, 1 Hagg. Ecc. 773, 781; s. c., 3 Eng. Ecc. 329; *Cooke v. Cooke*, 3 Swab. & Tr., 126; *Reese v. Reese*, 23 Ala. 785; *Reynolds v. Reynolds*, 4 Abb. App. 35; *Gholston v. Gholston*, 31 Ga. 625. The recent decision of the supreme court of Illinois, in *Sharpe v. Sharpe* (116 Ill. 509), to which we have been referred by the plaintiff's counsel, seems to be a good illustration of this principle, though the facts were not as strong for the wife as in this case, and one of the judges dissented. In that case the wife instituted proceedings for a divorce, under the Illinois statute, on the ground of extreme and repeated cruelty. There was evidence of actual personal violence on the part of the husband in two instances only, and seven years intervened between them. The suit was not commenced until about four years after the second offence of this character. Notwithstanding the lapse of time between the bringing of the suit and the last act of personal violence, and notwithstanding the fact that actual physical violence was inflicted upon two occasions only, yet these two acts, taken in connection with a course of hard and unkind treatment on the part

of the husband, extending over almost the entire period of their married life, more than twenty years, in the opinion of the court constituted a case exhibiting "extreme and repeated cruelty," within the meaning of the statute. See, further, *Ward v. Ward*, 103 Ill. 477; *Kennedy v. Kennedy*, 73 N. Y. 369.

It should, perhaps, be observed that there is a considerable discrepancy between dates of the offences as laid in the petition and those exhibited by the evidence. The petition seems to place them between the date of the marriage and June 1, 1887, or thereabouts; while many of them, according to the evidence, took place at a subsequent period, though prior to the institution of the suit. We do not regard a variance in dates as material, where no objection on the ground of such variance is made in the trial court. If such an objection had been made, no doubt it would have been followed by an amendment of the petition widening the dates; and there is nothing to indicate that the defendant was in any way prejudiced by the wide range which the evidence took in respect of time.

With the concurrence of Rombauer, J., the judgment will be affirmed; Lewis, P. J., is absent.