## GRACE F. VIERTEL, Appellant, v. WILLIAM VIERTEL, Respondent.

### Kansas City Court of Appeals, February 4, 1907.

1. **DIVORCE: Indignities: Language: Conduct: Threats: Evidence.** The evidence relating to the language, conduct and threats of a husband is reviewed and held to entitle the wife to a divorce on the ground of indignities.

2. ————: **Trial and Appellate Practice: Deferring to Trial Court.** Appellate courts regard with deference the finding of trial courts in divorce cases, but where the evidence preponderates against such findings and shows that the offending party has violated the solemn obligations of the marital relation, while the complaining party is free from blame, courts should not hesitate to grant a divorce, especially where the parties have mutually conceived utter dislike for each other.

3. ————: **Indignities: Condonation.** Condonation is but forgiveness upon condition of subsequent fidelity, and if not kept the right of the injured party is restored as if there had been no condonation.

Appeal from Cooper Circuit Court.—*Hon. William H. Martin*, Judge.

REVERSED AND REMANDED (*with directions*).

*W. F. Johnson* and *W. M. Williams* for appellant.

(1) The court erred in ruling that plaintiff was incompetent to testify to what occurred between her and her husband when no one else was present. The petition charged that he threatened to assault her and do her personal violence and made demonstrations as if to carry out said threats. She was competent to testify to such matters. Schweikert v. Schweikert, 108 Mo. App. 477; Maget v. Maget, 85 Mo. App. 9.    (2) If the allegations of the petition and the facts testified to by the plaintiff are true, she is clearly entitled to a divorce. In an action of divorce, a plaintiff is as much entitled

to a decree when the evidence establishes a statutory ground of relief as in any other action, and a court has no discretionary right to refuse it. The only question to be determined is whether a cause prescribed by the statute is made out. Lynch v. Lynch, 87 Mo. App. 32; Urey v. Urey, 80 Mo. App. 51. (3) This court, in divorce cases, as in suits in equity, will review the testimony and determine for itself the weight and credit to be given to the evidence, and direct such decree as the facts warrant. McCanse v. McCanse, 91 Mo. App. 1. The trial court made no finding of facts and the grounds of its decree are not stated in the record. The facts are open to review here. (4) Plaintiff testified positively and unequivocally to the indignities and threatened assaults charged in the petition. Her statements are clear and direct. Her testimony, as printed in the record, shows that she is a woman of refinement and culture. Nothing in the case reflects in the slightest degree upon her truthfulness or womanly character. She stands upon the record as worthy of credit. Her testimony is affirmative. She is corroborated in part by A. D. Edwards and Miss Fanny Hays, disinterested witnesses; and also by her mother and Hugh Fiscus, her brother. Defendant's testimony is in direct conflict with that of each and all of these persons. Their affirmative statements and his denials cannot both stand and be correct.

*John & J. W. Cosgrove* for respondent.

(1) To constitute indignities a course of conduct must be shown. Isolated facts are insufficient. Mahon v. Mahon, 70 Mo. App. 342; 9 Am. and Eng. Ency. Law (2 Ed.), p. 812; Kempf v. Kempf, 34 Mo. 211; 1 Nelson on Divorce and Separation, sec. 390; Cannon v. Cannon, 17 Mo. App. 390; Webb v. Webb, 49 Mo. App. 249. (2) Threats to abandon if made by defendant do not constitute indignities. Hooper v. Hooper, 19 Mo. 355; Cannon v. Cannon, 17 Mo. App. 394. (3) The trial court

committed no error in deciding that plaintiff could not testify to conversations between herself and her husband when no other person was present. Mrs. Viertel was not competent to testify to any conversation between herself and her husband when no other person was present. Lyons v. Lyons, 101 Mo. App. 499; Brown v. Brown, 53 Mo. App. 453; Moore v. Moore, 51 Mo. 118; Hall v. Hall, 77 Mo. App. 606; Dwyer v. Dwyer, 2 Mo. App. 20; Miller v. Miller, 14 Mo. App. 418. (4) The judgment of the trial court was right. The acts complained of by the plaintiff, according to her own testimony, were condoned. Adkins v. Adkins, 63 Mo. App. 351; Cope v. Cope, 103 Mo. App. 260; Moore v. Moore, 41 Mo. App. 176. (5) Quarrels resulting from uncontrollable temper and outbursts of intemperate and improper remarks, when provoked by the complaining party will not warrant a divorce. Webb v. Webb, 44 Mo. App. 229; 9 Am. and Eng. Ency. Law (2 Ed.), p. 813. (6) Plaintiff's mother was the disturbing factor in the family of these litigants. This is a case of too much mother-in-law, and plaintiff having insisted on her mother remaining, against her husband's will, ought not to be permitted to obtain a divorce based upon conditions brought about by the presence and conduct of her mother. Campbell v. Campbell, 73 Mo. App. 579. (7) The husband is the head of the family and it is the duty of the wife to conform to his style and manner of living without interference of the wife's relatives. Messinger v. Messinger, 56 Mo. 329; Jones v. Jones, 55 Mo. App. 523. (8) What would be an indignity in one case would not be an indignity in another. Much depends upon the sentiment and refinement of the party to whom the indignities were offered. A woman who boldly and without hesitation would repeat vile epithets, is not of that sensitive disposition that words of that character spoken to her, or in her presence, would render her condi-

123 App—5

tion intolerable. Hooper v. Hooper, 19 Mo. 357; Dawson v. Dawson, 23 Mo. App. 175; Barnes v. Barnes, 95 Cal. 171; Fleming v. Fleming, 95 Cal. 430; 29 Am. St. Rep. 124. (9) It is neither an indignity or a cruelty for a farmer's wife to milk cows. 1 Nelson on Divorce and Separation, sec. 297.

BROADDUS, P. J.—This is a suit for divorce on the ground of certain alleged indignities of the husband against the wife. They were married in 1891. At the beginning of the suit they had two children, one born to them having died previously.

The grounds relied on for a divorce are as follows: That on March 6, 1902, defendant threatened plaintiff with personal violence, by holding his clenched fist above her head and saying, "God-damn you, I'll kill you, you God-damned son of a bitch;" that he applied opprobrious and obscene words to her; that he threatened to abandon her and remove to Kansas City; that when she asked him for money to buy a wrap for herself he became furiously angry and said everything was going to hell; that he was going to have a sale and quit; that in 1901 he threatened to burn all the books in the house to prevent plaintiff from reading them; that plaintiff purchased a surrey for the use of the family out of her savings and defendant, to annoy and mortify her, threatened to walk behind his father's hearse to the funeral rather than ride in the surrey with her; that on the 21st of January, 1904, he said to plaintiff, "Don't you bring any God-damned piano into this house. By God, I'll kick the agent into the road, and I'll take an ax and split the damned thing to pieces. I'll let you know, by God, I'll have things as I say," which was said in the presence of others to humiliate her; that defendant required plaintiff to do the milking and other rough work in all kinds of weather to the injury of her health; that on July 1, 1905, he took up a chair and threatened to strike her with it,

and cursed and said it would not take him long to wipe out the whole family; that he was furiously angry, cursed plaintiff; that on the same morning, to harass and annoy plaintiff, he cut down the flowers at the door of their home and then told her of it; and that she was in danger of personal violence at the hands of defendant; and that in justice to herself for the causes assigned she was compelled to separate from and live apart from him.

The answer of defendant was a general denial of plaintiff's charges, except that he admitted having cut the flowers, but he justifies the act by alleging that they belonged to the species called "cosmos" and that the stalks had fallen across the sidewalk. He alleges that the surrey was purchased without his consent, and that the wheels were locked with a chain and that he told his wife that this was done to prevent him from using it and that under no circumstances would he ever ride in it. The answer alleged that plaintiff insisted upon having her mother live with them against the defendant's wishes, who treated him with disrespect, and who would not speak to him; that she had been divorced from her husband; and that she was the cause of plaintiff leaving him. Plaintiff's reply seeks to justify the retention of her mother in her home on the ground that she was afraid to remain alone with the defendant, and denies that defendant has any cause of complaint on that ground.

The court after hearing the testimony dismissed plaintiff's bill and she appealed.

The plaintiff testified that prior to her marriage she had been a school teacher and had at the time of her marriage about $350, she had saved from her earnings, which she turned over to defendant; that when they were married she moved to the home of defendant on a farm in Cooper county; that she left defendant on the 10th of July, 1905, and went to the home of her mother in Boon-

ville; that on the 1st of July previous, while at the break-
fast table, defendant drew a chair back and swore it
wouldn't take him long to wipe out the entire family, and
that he included in his language his two little girls who
were standing by her at the time. She stated that he did
not raise the chair over her, but drew it back in a threat-
ening attitude and said, "By God, it would not take him
(me) long to wipe out the whole family." This contro-
versy she says grew out of the fact of his cutting the
flowers.

That about March, 1902, defendant got angry one
morning because she did not get up early enough, when
plaintiff said she would get up when she got ready,
whereupon defendant said that when the working season
commenced he would have to go to the neighbors to get
breakfast; that her habit was to get up before any one
else in the morning, make the fires and prepare break-
fast, and that his language on that account made her in-
dignant; that defendant said, "By God, I will kill you,
you damn son of a bitch," and that he repeated the lan-
guage several times; that her mother was present at the
time, who said, "Will, don't strike her," and he said,
"God-damn her, I will kill her;" that then defendant flew
around the table and shook his fist in her mother's face
and said, "Grandma, you are the cause of this, you are
the cause of it all;" that plaintiff asked "if we had peace
before she came," and defendant said, "We had," where-
upon plaintiff said, "It is a lie, we have never had
peace;" that then defendant went back to his chair and
said that her chickens were the cause of the trouble; that
he had told her how it would be when she commenced
raising chickens; that after they had left the table she
said to him, "There is one thing of which you must be
sure, don't you ever lay violent hands on me, I warn you
in time, that's one thing I won't take;" that he then said,
"I will do it some day and when it is done I can't help

it;" and that she then said, "You can help it now you have warning," and he still said, "I will do it."

She testified that on the 1st of July of that year he called her a "God-damned fool and chicken crank;" that when she asked him for money he said everything was going to hell, that she could have four dollars, and that he was going to have a sale and sell off everything; that she had asked him for twenty dollars to buy a dress and jacket. That he threatened to burn her books to keep her from reading; that she asked him to get a surrey several times, when finally he refused to get it; that she bought the surrey without his knowledge; that when his father's funeral was to take place, he said he would walk in the mud behind his father's hearse before he would ride with plaintiff in the surrey; that she locked the wheels of the surrey without any thought of keeping defendant from riding in it, that she locked the wheels to keep the boys on the place from using it and not for the purpose of preventing defendant from using it; that she paid for the vehicle with her own money, that she realized from raising chickens and pigs on the farm. That while Miss Fanny Hays was visiting her and while they were at breakfast there was a card of a piano agent on the table that plaintiff had placed there, when defendant said, "Do you see that card?" that she said, "Yes," whereupon defendant said, "That fellow was over to see me the other day about a piano," and that without anything further said by her he went on to say, substantially, that he told the agent he was not going to buy one, that he need not come around to him about a piano and stated his views on the subject; that plaintiff then said, "It served the man right if you said those things to him, for I told him if there was a piano purchased here I would have to buy one;" whereupon defendant became furious and arose from his chair and beat the table with his fist and said, "By God, don't you bring any God-damned piano in this house, if you do I will take

an ax and split it to pieces, split the damned thing to pieces, and I will kick the agent into the street; I will let you know, by God, I will have things as I say."

She testified that on another occasion when one of her children was sick, herself and mother were sitting up with it at night, the mother was reading aloud, which had the effect of disturbing the defendant who had gone to bed in another room; that he became very angry and used loud and abusive language toward plaintiff and threatened to burn all the books on the place.

Miss Fanny Hays corroborates plaintiff as to what occurred at night when plaintiff and her mother were watching the sick child; and as to what occurred in the controversy about the piano at the breakfast table. A. D. Edwards also corroborates plaintiff as to what occurred on the occasion referred to when plaintiff and her mother were sitting up with the sick child, to the extent that he was sleeping in the house and was awakened by the loud voice of a man. This witness admitted that he told defendant since this suit was commenced that he did not know anything about the case and he is otherwise contradicted. Hugh Fiscus, plaintiff's brother, testified that defendant told him that plaintiff had so aggravated him about the flowers that he said to her, "Grace, you keep on making me so mad, I am a son of a bitch if I don't wipe out the whole family."

Mrs. Fiscus, the mother-in-law of defendant, testified: Defendant never made any objections to her living with his family until about three months before the separation; that at the time she and her daughter were sitting up with the child, that she was reading in an undertone when defendant who was in the next room jumped out of bed and screamed in a volley of language that was fairly terrific; that plaintiff went to his door and he said, "Don't come in here, Grace, if you do I will hit you, and if I hit you I will kill you." She corroborates plaintiff's evidence as to what occurred when defendant be-

came dissatisfied because plaintiff was late in getting up on a certain morning. She states that on another occasion the defendant charged plaintiff as being like John Viertel's wife, a woman of bad character, when plaintiff said to him, "Don't you ever throw that vile thing in my face again, I can't bear it;" that she was in the kitchen at the time; that she picked up an iron rod that was lying in the wood-box and went in where the two were; that before she went in she saw the defendant had hold of plaintiff; that she said to him, "Why, I will have a hand in this, don't you strike her." That another time she heard defendant say to plaintiff, "You don't know me, but by God I will show you what I am like some of these times."

The defendant Viertel testified that on the night his wife and mother-in-law were sitting up with the child he had gone to bed and that the latter was reading so loud that it disturbed him, and he asked her to quit, which caused her to get mad and to read the louder, and that he did threaten at that time to burn the books; and that he never called plaintiff a son of a bitch; and that he never refused to give her money.

In reference to the surrey, he said that he did not think it best to buy a surrey from the dealers plaintiff bought of and said to his little girl who had asked him which kind of a surrey he liked best, there being a description of several kinds present, that "I, Mamma and Gladys (the name of her sister) and you will go down to Mr. Weyland's, Hudson's and Roeder's and any one there that will suit we will buy, no matter what it costs;" that he next saw the surrey his wife had bought without his knowledge at his place with the wheels locked with a chain; that he then informed his wife that, "It looks mightily like to me that you bought a rig for the family," and told her as she had put a lock on it to keep him from riding in it that he would not ride in it. He denies having said that he would walk behind his fa-

ther's hearse in the mud before he would ride in the surrey. He walked to the place before the funeral as there was no other way for him to get there as he had only one horse which hauled the surrey which was fully occupied by the other members of the family; that he never raised his fist at any time to strike his wife; that he did not say his wife was like John Viertel's wife, but that his mother-in-law accused him of having said so; that he then said, "If I ever thought my wife did and I caught her that I would kill her;" and that he requested his wife to tell his mother-in-law that he did not want her to stay there any longer, and that his wife said, "If mother leaves, I will leave too."

Defendant admits saying to his wife that if she brought a piano in the house without his knowing it like she did the surrey, he would take an ax and smash it all to pieces and would kick the damned agent out in the big road, and that was all he did say about the matter. He stated that his mother-in-law was a woman of violent temper and that for years he and she were not on speaking terms. Mr. Henry Brown testified that he heard plaintiff say she would not live under any roof where her mother was not permitted to live.

There was other evidence on both sides, but we do not deem it important to state it for the general purposes of the case, but special reference will be made in the course of the opinion to some of it that has been omitted.

It will appear from the statement made of the facts that the plaintiff has been corroborated in her testimony in many material matters, while defendant's side of the case rests almost wholly upon his negative testimony. In reference to what transpired at the breakfast table and on the occasion when defendant claimed to have been disturbed at night at the time the mother-in-law was reading aloud while she and plaintiff were sitting up with the sick child, the plaintiff is sustained by the evi-

dence of Miss Hays. The trouble in the first instance grew out of the talk about the purchase of a piano. If the language he used towards his wife in the way of the most revolting abuse and threats against her person was not an indignity within the meaning of the law authorizing a decree of divorce, it would be difficult to prove a case that would justify it, short of actual assault and battery. Defendant admits that he threatened to burn the books so that his wife would have nothing to read. As she was a woman of education, in this day and age of general intelligence it would not be going too far, we believe, to say that a home, especially on a farm, without books to employ the mind during the leisure hours of a person of her education would be little less tolerable than a prison.

The defendant admits having cut down plaintiff's flowers that were growing near the front of the house, but he justifies the act on the ground that they were falling down on the walk. He knew when he committed the act he was doing something that would displease his wife. And it did have that effect which was the occasion for his again abusing her in the foulest terms accompanied by threats. And he admitted to his wife's brother that he did use the language and make the threats. He denies that he made the admission as stated by his brother-in-law; but by all the rules of evidence the weight of the testimony is against him. It is true the cutting of the flowers or the plants was but a little thing in itself, but it is the little things in our lives that often give the index to our characters and lay bare the motives of our conduct. Instead of training the plants so that they would not encumber the walk which he might probably have done with as little labor to himself as that he expended in cutting them down, he deliberately destroys them, although he knew that his wife took pleasure in them. We are aware of the fact that all men are not constituted that they appreciate the beautiful, but they

ought to be just to those who do, especially towards a wife.

We will make no special reference to those instances testified to by the wife and corroborated alone by the mother-in-law, except that wherein plaintiff says the defendant likened her to the wife of John Viertel, a woman of notorious bad character. Defendant denies that he did so, but admits that he said if he should ever think and find her to be such he would kill her. While, as he states the occurrence, he made no charge against her virtue, his language certainly implied that he harbored suspicion in his mind equivalent to what he was charged with saying, and that much more was said by him than he admits having said.

Defendant attributes the disagreements between himself and wife to the interference of his mother-in-law. The evidence shows that he disliked her and she entertained a great dislike to him. And it would have been better for her to have made her home with some one else. While it is true her presence in the house was calculated to engender discord, it is not available as a justification for the brutal conduct of the defendant as shown by the evidence.

In our conclusions thus far, we have left out of consideration the evidence of the mother-in-law. As she had been divorced from her husband, the inference is indulged impliedly by defendant's counsel that her evidence should have but little weight. Notwithstanding her separation from her husband, she might, for aught that is shown from the record, be entitled to full credence. The defendant introduced witnesses whose testimony was that plaintiff said that she would not live under any roof where her mother was not permitted to stay with her. It is thus shown by the affection of her daughter, whose respectability and worth are admitted, and by the conduct of one of her sons towards her that she is a creditable person. And after making due allowance for

her prejudice against defendant on account of her hostility to him, if proper credit is given to her testimony in connection with other circumstances of the case, plaintiff is sustained in important particulars other than those mentioned by Miss Hays.

It is insisted by plaintiff's counsel that plaintiff is a woman of education and refinement and therefore the abusive treatment she received at the hands of defendant was the more hurtful. While defendant does not deny that plaintiff was educated, he denies that she was refined and cites the instance when she said to the defendant that he was a liar. As the defendant insists upon this conduct as being prejudicial to the plaintiff he must also admit the provocation. The provocation was the statement of defendant that plaintiff did not get up early enough to get his breakfast and that when the working season arrived he would have to go to his neighbors for that purpose. Her uncontradicted statement was that she got up in the mornings before any one else, made the fires and got breakfast with the exception of that particular occasion. Under the circumstances, the taunt of defendant was calculated to provoke even a refined woman to use unbecoming language. The language of the defendant was cruel and undeserved. No man who had a proper regard for his wife, who was burdened with the drudgery of making the fires and cooking for the family, would have acted as the defendant did. And the fact that plaintiff read "David Harum" and "The Smart Set," although by some considered undesirable literature, does not prove that she was unrefined, for many good and refined people do read similar books.

Notwithstanding the appellate courts regard with deference the finding and decrees of the trial courts in cases of this kind, a sense of justice forbids that we should affirm the decree in this case. The evidence greatly preponderated in favor of plaintiff and the charges were well sustained, as has been stated, in many important

particulars. We do not believe that the courts should be hasty and too liberal in dissolving the marriage tie, but on the other hand, where the facts are such as show that the defendant has violated the solemn obligations of the marital relation and the complaining party is free from blame, the courts ought not to hesitate to grant relief. In this case, the plaintiff, who is admitted to be a good woman, has conceived toward defendant on account of his treatment of her, utter dislike. And the record, we think, sufficiently shows that the feeling is reciprocated by the defendant. We think that the interests of society as well as the parties themselves demand that they should be divorced in law as well as in fact.

It is necessary perhaps to notice the point made by defendant that the greater part of the offenses charged were condoned, as the plaintiff admitted that defendant was not at any time forbidden his rights as husband until within thirty days before she left him. But she did not admit that he exercised any such right after the final scene which culminated in the separation. Condonation is but forgiveness upon condition of subsequent fidelity. If the condition is not kept, the rights of the injured party are restored as if there had been no condonation. [Guthrie v. Guthrie, 26 Mo. App. 566; Moore v. Moore, 41 Mo. App. 176; Welch v. Welch, 50 Mo. App. 395.] Much more might be said that would authorize a decree for plaintiff, but we deem it unnecessary to add anything further to that end.

As this court cannot well determine upon the facts before us the question of plaintiff's claim for alimony and her right to the care and custody of the two children, the cause is reversed and remanded with directions to the circuit court to enter up a decree of divorce in favor of plaintiff and to adjudge to her alimony and fix the amount, and decree the care and custody of the children as may be right and proper. All concur.