CARRIE S. DIMMITT, Respondent, v. JAMES J. DIMMITT, Appellant.
No. 10005.

CARRIE S. DIMMITT, Appellant, v. JAMES J. DIMMITT, Respondent.
No. 10006.

Kansas City Court of Appeals, October 7, 1912.

1. **DIVORCE: Evidence: Finding of Court.** Where evidence in a divorce suit is conflicting and evenly balanced the appellate court defers to the judgment of the trial court; but, if the conclusion of the trial court appears to be in conflict with the clear preponderance of the evidence, the appellate court will exercise its prerogative of weighing the evidence and making its own finding of facts.

2. ———: **Indignities.** Spying on the wife, without the slightest pretext for being suspicious of her, making a public scene of his discovery and the suspicions he professed to entertain, recklessly and falsely accusing her of infidelity and refusing to accept the explanation that would have satisfied any reasonable person of her innocence, are indignities on the part of a husband which render the condition of the wife intolerable.

Appeal from Randolph Circuit Court.—*Hon. A. H. Waller*, Judge.

REVERSED AND REMANDED (*with directions*).

*R. S. McClintic, Humphrey & Goss, M. J. Lilly* and *F. W. McAllister* for plaintiff.

*Merriwether & Merriwether, Harry J. Libbey* and *J. P. Boyd* for defendant.

JOHNSON, J.—Action for divorce instituted in the circuit court of Monroe county, October 24, 1910, and transferred on change of venue to Randolph county where it was tried in June, 1911. After hearing the evidence the court rendered judgment grant-

ing plaintiff a divorce and disposing of the issue of the custody of an infant child born of the marriage. Both parties appealed, defendant from the decree of divorce, and plaintiff from that part of the judgment affecting the custody of the child.

The parties were married in Monroe City, January 31, 1907, and lived as husband and wife in that city until their final separation which occurred October 22, 1910, two days before the commencement of this suit. Two children were born of the marriage but at the date of the separation, only one was living—a boy then two years old. At the date of their marriage plaintiff was twenty and defendant twenty-three years of age. The parents of plaintiff had been divorced and her father, Corbin G. Stewart, died in 1909. After her divorce the mother of plaintiff had married a Mr. Levy, a merchant of Monroe City and plaintiff was reared in Monroe City as a member of the Levy family. She is described by the witnesses as a modest, retiring and diffident young woman, deeply attached to her mother and but little inclined to social intercourse. Defendant, who is the son of Frank Dimmitt, a banker of Shelbina, was engaged in the jewelry business in Monroe City. The evidence of plaintiff portrays him as a man of crabbed dictatorial and jealous disposition. The first year of the married life of the young couple was uneventful but after that serious disagreements arose that were marked by outbursts of temper on the part of defendant and finally culminated in the complete alienation of plaintiff's affection for her husband and her refusal longer to live with him. It is the contention of defendant that the estrangement of his wife and the wrecking of their marital happiness was caused primarily by the unwarranted interference of her mother in their affairs but we agree with the learned trial judge that this charge is not supported by the weight of the evidence.

It does not appear that Mrs. Levy, who evinced a lively interest in her daughter's welfare, transgressed the bonds of parental solicitude, and we think as did the trial judge that the unprovoked and, at times, violent ill treatment of plaintiff by defendant was the cause of the separation. Defendant not only subjected his wife to verbal abuse and threats of physical violence but more than once struck her in anger and threatened to kill her. A single act of plaintiff served to accentuate this ill treatment and to afford defendant an excuse for giving rein to his turbulent passions. He discovered her in a falsehood concerning a visit she made to the office of their family physician and thereafter used the advantage thus obtained as ground for repeated abuse and accusations of infidelity.

The circumstances under which plaintiff told her husband a falsehood thus may be stated. Plaintiff was the sole heir of her father who, as stated, died in 1909. By the provisions of the will of his uncle, Dr. Frederick Campbell Stewart, who died in Italy leaving a large estate in Philadelphia, plaintiff, as heir of her father, became the owner of the remainder of an estate in which a life interest was devised to one of the testator's daughters who is an elderly woman. At the request of plaintiff's mother, George A. Mahan, a brother of Mrs. Levy and a prominent lawyer in Hannibal, made an investigation of the interest of plaintiff in the Stewart estate and under date of December 17, 1909, wrote Mrs. Levy a letter giving the results of his investigations and his professional advice. Among other things he stated that an insurance company, on the assumption that plaintiff would survive the life tenant, would advance plaintiff twenty-five thousand dollars on account of her remainder, on the assignment by her of an interest in the estate double in value the amount of the advancement. Mr. Mahan said in the letter: "When I get further details of this matter

I will run up to Monroe City and have a talk with you and Carrie (plaintiff). In the meantime I want you to keep well in mind that this is a business transaction, not to be noised around Monroe City or anywhere else, or discussed to anyone but Carrie and Mr. Levy if you wish, with the strict injunction that he shall not speak of it. I do not wish Carrie's husband to know anything about this matter and if you don't think Carrie can keep it from him then I would prefer that you do not tell her. He is all right so far as I know but talks too much and if this thing gets noised abroad it will make it all the more difficult for me to work in the matter.''

Mr. Mahan continued to work on the case and on returning from a trip to Philadelphia, wrote Mrs. Levy on June 30, 1910, to the effect that by selling part of the remainder to the insurance company he could obtain twenty-five thousand dollars in cash for plaintiff, leaving an estate of about one hundred thousand dollars to pass to her on the death of the life tenant. In closing the letter he said: ''Now you have Carrie go to a good doctor and have her regularly examined as if for life insurance. You can learn what doctor does this and he can get the blanks from some life insurance agent. Have this done right away and send it to me at Hannibal.''

These letters were shown to plaintiff and their substance was discussed by her and her mother. They were not shown to defendant and though plaintiff told him in a general way about her interest in the estate, she did not disclose the subject about which her uncle enjoined her to secrecy. In obedience to the request in the last letter, she visited the office of her physician and was examined as for a policy of life insurance. At her request the physician promised not to divulge the fact of her examination to her husband. On her way

167 Mo. App.—7

to the office of the physician she stopped at her husband's store to leave the baby in his care. He asked her where she was going and she replied she was going to see her dressmaker. A moment after she left the store he followed with the baby intending to buy something for the child at a nearby store. Observing his wife turn in a direction away from the dressmaker's place of business his suspicions became aroused and he followed her to ascertain where she was going. When he turned a street corner she had disappeared and, meeting an acquaintance, he inquired of him the course she had taken and was informed she had gone into the physician's office. He went back to his store and on the return of his wife asked her where she had been and was told she had been to see her dressmaker. He informed her she had been seen going into the physician's office and accused her of lying to him. She admitted the falsehood, gave him a true explanation of the purpose of the visit and of the motive that led her into the false position. She exhibited the health certificate the physician had given her and he examined it. Nothing she said or did appeared to satisfy him; he was cruel in his abuse and accusations and at the close of the scene at the store (which was stormy and to the last degree humiliating), plaintiff went home with the baby and defendant called on the physician at his office. At first the physician denied that plaintiff had been to his office but on being informed that defendant was cognizant of the true facts admitted the visit and stated its object. After that defendant ceaselessly subjected his wife to cruel and unreasonable abuse. Repeatedly he accused her of unchastity and occasionally punctuated oral vituperation with physical violence. Plaintiff, aided by her mother and stepfather, spared no pains to convince him that her sole error was the falsehood she had told him and that she had been led into it by

the advice and admonition of her uncle. He would not be placated but continuing his accusations of infidelity (which he now confesses were untrue), threatened plaintiff with death, declaring that he would kill her, her mother and the physician. One day he came home with a loaded revolver and a bottle of whiskey —a bad combination—and declaring that "hell was in. him" threatened the life of plaintiff.

The ill treatment of defendant became intolerable and fearing he would execute his deadly threats, plaintiff fled with her baby to the home of a neighbor. She had not been there long before defendant procured a conveyance, went to her asylum and literally tearing the baby from her arms, took it to his father's home in Shelbina. Plaintiff and her stepfather followed on the first train and arrived at Shelbina before defendant. The next day a reconciliation was effected and the parties entered into a written agreement expressive of a mutual intent to forgive and forget their past differences and to resume the status of husband and wife. They returned to their home and lived together a week but defendant did not keep his promises. He resumed his abusive conduct, repeated the accusations of infidelity and threatened to take the life of plaintiff. Again she left him, taking her baby with her, and two days later brought this suit.

Plaintiff, in her petition, bases her right to a divorce on the ground of intolerable indignities and in a general way we have referred to the evidence supporting her specific allegations. The answer, in effect, is a general traverse and a plea of condonation.

The learned trial judge enjoyed the advantage of having the parties and witnesses before him and we are satisfied with his solution of the issues of fact reflected in the judgment. Where the evidence is conflicting and evenly balanced in a cause of this character the appellate court defers to the judgment of the

trial court. It is only in cases where the conclusion of the trial court appears to be in conflict with the clear preponderance of the evidence that an appellate court will exercise its prerogative of weighing the evidence and making its own findings of fact. [Munchow v. Munchow, 78 Mo. App. 99; Nichols v. Nichols, 39 Mo. App. 291; King v. King, 42 Mo. App. 454; Maget v. Maget, 85 Mo. App. 6; Libbe v. Libbe, 157 Mo. App. 701.]

In our own view of the evidence it abundantly sustains the conclusion that defendant was guilty of grave offenses against the marital relation. The oral abuse he continuously inflicted on his wife was extremely insulting and as he now admits wholly unmerited. A woman's character and reputation for chastity are her dearest possessions and a husband who falsely accuses his wife of impurity and by his acts and words gives publicity to his accusation inflicts a deadly blow on one he is bound by the strongest of human obligations to protect and honor. And further our law looks with deep aversion upon the wife beater. No decent husband would strike his wife in anger except in necessary self-defense and the courts of this State always have pronounced recreant the violator of this inflexible rule. The excuse defendant offers for these breaches of marital duty does not justify him.

We do not give our approbation to the conduct of plaintiff in telling her husband an untruth about the visit to her physician and we think her mother and uncle deserve reproof for counseling a young and inexperienced wife to take a step that their experience should have told them might lead her into a position of deception and falsehood. No consideration of property rights or pecuniary advantage can weigh in the balance with marital happiness and concord and such happiness cannot long endure where concealments and

deceptions are practiced by one spouse upon the other. Though plaintiff was guilty of a serious wrong the circumstances under which it was committed in a measure palliate her guilt. She was dealing with her own separate estate which was large and in a condition requiring the services of a lawyer of the highest professional skill. Her husband not only was young and inexperienced but was a man of irregular habits, of a headstrong and somewhat turbulent disposition and he had forfeited her confidence and alienated her affection by his unmanly and, at times, even brutal conduct. It is not surprising that having lost confidence in her husband she followed the advice of her mother and her uncle in her own business affairs and we are inclined to think of her mistake in deceiving her husband as a not unnatural consequence of his injustice rather than as an act evincing a purpose on her part of violating her marital duty. Certainly this single wrong committed under such extenuating circumstances cannot be considered as an indignity that would have entitled defendant to a divorce nor did it justify his subsequent bitter treatment of his wife. Indeed the conviction is forced upon us that defendant, conscious of his own wrongdoing, was seeking a semblance of justification in his wife's conduct and that he hailed the discovery of her falsehood as an excuse for even greater mistreatment and insult. Spying on his wife without the slightest pretext for being suspicious of her, making a public scene of his discovery and the suspicions he professed to entertain, recklessly and falsely accusing her of infidelity and resolutely refusing to accept the explanation that would have satisfied any reasonable person of her innocence, were acts indicative, at least, of a reckless indifference to her happiness and reputation. One cannot imagine greater indignities than these that could be offered to a pure and sensitive woman. The evidence does

not support defendant in his plea of condonation. After the first separation plaintiff forgave defendant and resumed cohabitation with him on his solemn assurance that his offenses would not be repeated. He broke his promise, repeated the indignities with increased exacerbation and drove plaintiff into leaving him again. "Condonation is but forgiveness upon condition of subsequent fidelity. If the condition is not kept the rights of the injured party are restored as if there had been no condonation." [Viertel v. Viertel, 123 Mo. App. 63, and cases cited.]

We approve that part of the judgment granting plaintiff a divorce and pass to the issue of the custody of the child which now is about four years of age. In such cases the consideration of first importance is the welfare of the infant child. We are satisfied the judgment before us in sending the child alternately to each parent for a period of two weeks would prove injurious to an infant, especially to one of such tender years. The child needs a mother's care and the mother is a good woman who can give it a good home, and an environment suited to its proper development. The custody of the child should be awarded to her for the present with the privilege granted defendant to visit the child at reasonable intervals.

The judgment is reversed and the cause remanded with directions to enter judgment in accordance with the views expressed.

All concur.

## ON MOTION FOR REHEARING.

We shall not discuss that part of the motion for a rehearing filed by defendant which relates to the decree granting plaintiff a divorce since we are satisfied with the views we expressed on that subject and the motion contains no argument or authority we have not already considered.

We shall say something additional about the treatment we have given the subject of the custody of the child. Defendant asserts in his motion and offers ex parte evidence in support of the assertion that awarding the custody of the child to plaintiff with the privilege accorded defendant of reasonable visits would result in the practical estrangement and separation of his child from him owing to the disinclination of plaintiff to give reasonable obedience to such order. He points out that at one time the circuit court gave plaintiff the custody of the child on similar terms and that she made his visits so unpleasant and kept the child under such espionage while it was in his presence that her conduct amounted to a disobedience of the court's order. Plaintiff denies these charges and we will say at the outset that we shall not go into this disputed issue of fact. On the view we entertain that the welfare of the infant demands that it shall have a home with one or the other of its parents and not be shifted from one to the other at brief intervals, and that a child so young needs the care of its mother we are disposed to allow her to have its custody for the present if she will give proper obedience to the order granting defendant the right to visit it at reasonable intervals.

If plaintiff should think she can satisfy such order by an unwilling, captious and merely technical compliance and should attempt to discourage defendant's proper visits by making them difficult and disagreeable, she will suffer the penalty of having her child taken from her. We remand the entire subject of the custody of the child to the circuit court with directions to make such orders from time to time as its welfare may appear to demand, giving to the mother its custody during the period of its tender infancy and as long as she shall faithfully obey the orders of the court, and giving to the father the privilege of rea-

sonable visits as long as he exercises that privilege in a proper manner. If he should abuse it, as plaintiff fears he may, by attempting to make it the instrument of torture or fear to her, the privilege must be taken from him. Neither party should be suffered to degrade the sacred rights and offices of parentage to the base uses of malice or hatred. Should it appear in the future that the welfare of the child will permit a division between the parents of the right of custody, we think the circuit court, on application of the father and on finding that he has conducted himself in a deserving manner, should modify the order to the extent of allowing him to have the custody of the child for such periods and in such manner as not to interfere with its proper nurture and education.

The motion for rehearing is overruled.