HANNAH E. MEEK, Appellant, v. W. K. MEEK, Appellant.

Kansas City Court of Appeals, December 21, 1914.

1. **DIVORCE: Evidence.** In an action for divorce by the wife and cross-bill by the husband the trial court found against both parties. On appeal the evidence is examined and the conclusion reached that the wife was entitled to the divorce.

2. ———: **Separation and Return: Condonation.** If the husband continuously abuses his wife until her condition is intolerable and she leaves him and then returns, and this is repeated seven times, through a series of years, and her return each time is on his promise to change his conduct and treat her better, there is no condonation, and a breach of his promise revives the offense.

Appeal from Buchanan Circuit Court.—*Hon. Wm. H. Haynes,* Judge.

REVERSED AND REMANDED (*with directions*).

*Kendall B. Randolph* for appellant.

*Goldman & Liberman* for appellant.

ELLISON, P. J.—Plaintiff's action was instituted to procure a divorce from defendant. He filed a cross bill in which he asked a divorce from her for her fault. The trial court refused each of them and each appealed to this court.

The petition alleges the parties were married in December, 1889, and lived together until August, 1913. The ground of divorce is indignities, becoming finally so continuous and gross as to compel her to leave him. Among these were frequent assaults and batteries, serious threats and overwork. Defendant's cross bill, in turn, charges indignities against plaintiff, consisting in her leaving him eight times, in cursing him, threatening to poison him and in "corresponding with men." The words of the charge of desertion are these: "That she has at eight different times left defendant's home and gone away for a considerable period of time, and afterward returned to defendant and promised to behave herself and defendant has each time forgiven her."

The evidence showed both parties to be high tempered and that each used profane words of abuse to the other. Her language, while not to be justified, was called out by extreme provocation. Passing by these incidents, we think it established that he struck her with a chair, that he frequently assaulted her with his hands, that he pulled her hair and tore away a neck tie she wore and choked her. Defendant owned a good farm and there was much work to do in and about the house. Plaintiff did this work, sometimes it was exceedingly heavy. Whether work put upon the farmer's wife approaches cruelty, or abuse, depends much on her health and strength and knowledge of how it should be done; and whether the work she is required to do is unreasonable, depends much on the husband's means and their situation in life. If he is financially able he employs assistance for himself in the labor

usually performed by men and so, in such situation, he should employ help for her in the arduous duties usually performed by women in the house and about the premises. It is hard to determine from the record whether plaintiff's work approached cruelty or was even unreasonable, the circumstances considered. So therefore we pass by that phase of the case and take up that where the evidence is clearer.

We think defendant's own testimony bears out our statement that he assaulted her. His explanation of how he struck her with the chair is poor. He said that wanting to wash his feet on the porch, he asked her to get him a chair, that she did so, but in giving it to him, she set it on one of his corns ''and I threw it off of my foot and if it struck her I did not know it.'' That he ''just pushed it off his corn.'' On cross-examination he said ''I pushed it with my foot back into the house, and if it hit her, I did not know it.'' Plaintiff's testimony and that of her daughter showed clearly that he threw the chair at her and struck her on the leg with much force. In regard to choking her, he said he jerked a neck tie off her neck because ''she was tantalizing me about other men;'' and ''If I choked her that was the only time.''

Furthermore we think it established that he told her that he had gotten some one to kill her on the road. It is perhaps true that he had not in fact done so, but he admitted to a reliable witness that he had so threatened her, without intending to carry it out.

At one time she had him arrested for ''abuse.'' The constable took a neighbor along and arrested him and took him to his (constable's) house, and kept him in custody an hour or two, but she remained away for some time and he came several times and ''begged her to come back and promised her different things, and she stuck to it and they finally decided to divide up and let her have her things.'' This was done, but after-

wards he sought her out and persuaded her to come back.

It is certain that the several times she left him were caused by conditions which had become unbearable to her and that he was the cause of these conditions there was ample testimony, corroborated, we think, by the circumstances of his own conduct in going after her and persuading her to come back by many promises of easier conditions and better treatment. He testified that on one of these occasions she told him that "I would rather die than go home with you."

Some of the charges against her were of a very damaging character. It was brought out that she struck him with a barrel stave. But we think that was shown to be accidental and defendant concedes that she immediately disclaimed intending it. Then one witness who had worked for them, testified to a remarkable story to the effect that when defendant was about to sell some hogs, she told the witness that she would get some chloroform and "send him to sleep," if he (the witness) would gag her and tie her hands, and then give the alarm. She denied the story and the statement of the witness standing alone is not sufficient to convince us that she made such proposal. It seems that he never attached enough importance to it to warn defendant. Again there were some letters in evidence which were written by her at times when she had left him and one that she did not write. It would serve no purpose to enter into a lengthy analysis of these. Suffice it to say that each of these parties had suspicions (we think ill founded in each) as to the appearance of something taken to be a powder, or some sort of poison. One of these concerned plaintiff's desire that it be tested by an expert. Throwing aside the letter which we think was not shown to have been written by her, there was nothing to affect her right to relief.

It would be impractical to enter into a discussion of every incident which appears in the record. We have not noticed defendant's suggestion that plaintiff did not prove a good character, for the reason that we think the evidence in that respect was ample. Nor have we noticed the charge that at one or more times when she left defendant, she took money with her, for the reason that we have not thought it sufficient to interfere with her complaint. Nor do we need to notice the suggestion of condonation, further than to say that we have not found an offense by plaintiff for defendant to condone. And as for plaintiff's return to him, it was under the promise and the hope of better treatment. When the promise is broken, so likewise is condonation. [Moore v. Moore, 41 Mo. App. 176; Guthrie v. Guthrie, 26 Mo. App. 566; Welch v. Welch, 50 Mo. App. 395; Viertel v. Viertel, 123 Mo. App. 76.]

The judgment will be reversed and the cause remanded with directions to enter a decree of divorce for plaintiff for the fault of defendant, and that the trial court grant plaintiff such alimony as may, upon hearing, be found to be proper. All concur.