LENAH TATE, RESPONDENT, v. WILLIAM M. TATE, APPELLANT.—59 S. W. (2d) 790.

Kansas City Court of Appeals, April 3, 1933.

Certiorari denied by Supreme Court, June 10, 1933.

*Henry B. Hunt* for respondent.

*James F. Gore* for appellant.

TRIMBLE, J.—This case is a suit for divorce brought by a wife against her husband. It was filed in the Circuit Court of Atchison County, Missouri, in vacation, on the 18th day of December, 1930. Summons was duly issued and served upon the defendant in said County on the 20th of December, 1930.

At the August Term, on August 24, 1931, an amended petition was filed, in which among other things, plaintiff alleged that she was lawfully married to defendant on the 17th day of May, 1930, in Springfield, Illinois, and continued to live with him as his wife until November 15, 1930; that she faithfully demeaned herself and discharged all her duties as such wife, treating him with kindness and affection, but that defendant, wholly disregarding his duties as husband, offered such indignities to plaintiff as to render her condition intolerable in this: (here were set out the alleged indignities.)

Said amended petition contained this further allegation:—

"Plaintiff further states that the offenses and injuries complained of, were committed within the State of Missouri, and while both plaintiff and defendant resided within said state."

On the same day, August 24, 1931, defendant filed answer admitting the marriage and that they continued to live together from said May 17, 1930, until November 15, 1930, and that no children were born of said marriage. The answer denied every other allegation in the petition.

The trial court, after hearing the evidence, found that "the offenses and injuries complained of were committed within the State of Missouri, and while both plaintiff and defendant resided within said state."

The court further found that the marriage took place as alleged and that since said marriage defendant, wholly disregarding his duties as husband, "has offered such indignities to the plaintiff as to render her condition intolerable; that the above matters so alleged and proved in behalf of the plaintiff are sufficient in law to entitle her to the relief prayed for," that plaintiff should recover alimony in the lump sum of $2500; that there were no children born of said marriage and that plaintiff's maiden name be restored to her. Judgment was rendered in accordance therewith. The defendant thereupon duly appealed.

It is conceded that after the marriage on May 17, 1930, in Springfield, Illinois, the parties took a short honeymoon trip and then went to reside in defendant's home in Tarkio, Atchison County, Missouri, and there resided until their final separation on November 15, 1930. The evidence further shows that the alleged grounds of divorce occurred in Atchison County, Missouri, while both parties lived in said state, and that after the separation plaintiff remained in the city of Tarkio until her petition for divorce was prepared. It is not shown in the record just when plaintiff took her effects and personal property and went to live at the home of her mother in Springfield, Illinois. The abstract of the record discloses that at the opening of the trial on August 24, 1931, plaintiff testified that she was "living at the present time in Springfield, Illinois."

Plaintiff was partially blind in childhood and for years before she was married was totally blind which fact was, of course, well known to defendant at the time, and long before, he married her. At the time of the marriage he was fifty-five years of age, a farmer and a resident of Tarkio, Atchison County, Missouri.

Nothing was urged, nor point made, about plaintiff's place of residence nor any question raised as to the sufficiency of her petition, in the trial court. Appellant's brief now makes the point that the petition does not state that the plaintiff is a resident of this State, hence the contention is that it states no cause of action and the trial court was without jurisdiction to render a judgment of divorce.

Counsel for defendant, Hon. Lucien J. Eastin, who tried the case,

afterward met with a tragic death through the overturning of his automobile, and counsel for defendant in this court did not have anything to do with the case in the trial court. It seems to us that, as a matter of fact, the record is not sufficiently clear and explicit or definite enough to show when plaintiff left the State after the separation, nor whether she left the State permanently with the intention of establishing her domicile in Illinois, even if there be any vital force and effect in the objection and point now made. That this blind woman, although able to make a living in certain occupations, should, when no longer able to live at home with her husband, go to the home of her mother in Illinois and stay there until her divorce action was tried is not sufficient merely in itself to show that she had become a *resident* of Illinois, especially where the record contains evidence that at the time of and before leaving her husband's home she was contemplating going to St. Louis, Missouri, and finding work there by which to support herself. This illustrates why it is better to raise the objection here considered in the trial court where the question, in its minutest evidential bearings, can be inquired into and fully developed. Of course, if the absence of the entire and ultimate *power* or jurisdiction of the court to hear and adjudicate the case, appears on the face of the record, then the question may be effectively raised in the Appellate Court for the first time. But not necessarily so under the circumstances of this case.

No doubt Section 1351, R. S. Mo. 1929, 2 Mo. St. Ann., p. 1558, is not jurisdictional in the sense that the court has no power whatever to hear the case regardless of the circumstances. This section merely prescribes the venue. [Nolker v. Nolker, 257 S. W. 798.] The venue may be waived, and it would seem that, if any point could have been made herein, it was waived in this case. [Osmak v. American Car & Fdry. Co., 40 S. W. (2d) 714; Walton v. Walton, 6 S. W. (2d) 1025.]

In the case at bar, Section 1353, R. S. Mo. 1929, 2 Mo. St. Ann., p. 1562, affords the necessary jurisdiction to try the case, and under it the allegations of the petition are sufficient, and any other incidental or subsidiary matters are waived. Said section is as follows:—

"Sec. 1353. No person shall be entitled to a divorce from the bonds of matrimony who has not resided within the State one whole year next before filing of the petition, *unless the offense or injury complained of was committed within this State or whilst one or both of the parties resided within this State.*"

The petition is sufficient. [Matthews v. Matthews, 34 S. W. (2d) 518, l. c. 522; Johnson v. Johnson, 95 Mo. App. 329, l. c. 331; Barriceilli v. Barricelli, 300 S. W. 1023; Coulter v. Coulter, 124 Mo. App.

149, l. c. 153; Arndt v. Arndt, 177 Mo. App. 420; Clark v. Clark, 191 Mo. App. 278, 279.]

As heretofore stated, there is no showing that plaintiff has changed her domiciliary residence to Illinois. [Humphrey v. Humphrey, 115 Mo. App. 361, 363; State ex rel. v. Davis, 199 Mo. App. 439, 445.]

Plaintiff having lived with defendant in Missouri less than one whole year at the time she was obliged to leave his home in Tarkio, Atchison County, Missouri, properly based her suit on the jurisdictional allegation that the offense and injuries complained of, were committed in this State, and while both of the parties resided therein. [Section 1363 *supra;* Clark v. Clark, *supra.*]

It is urged that the evidence is insufficient to justify the trial court in granting plaintiff a divorce. It is true that in a number of cases it is said that divorce is rarely granted on the uncorroborated evidence of one of the parties; that a divorce will not be granted on the evidence of the parties *alone,* when their evidence is in conflict; that the grounds for a divorce must be established by a preponderance of the evidence and the burden is on the plaintiff to show that she is the innocent and injured party. However, the difficulty is, the evidence in this case is not such as will permit the application of these principles so as to justify the appellate court in reversing the trial court's judgment rendered on the evidence. It is impossible to lay down any hard and fast, or definite, rule applicable to all cases so as to determine what will constitute "indignities" affording grounds for divorce. The term "indignities" in our divorce statute is not capable of exact or precise definition. They must be more than mere light, inconsequential matters irritating though they be, but should be of such continuity, force or moment as to amount to a species of mental or physical cruelty, which would render one definitely and fundamentally unhappy and make his or her condition intolerable; and each case, in this regard, is to be largely determined according to its own peculiar circumstances. [Bassett v. Bassett, 280 S. W. 430, 435, and cases cited.]

With these observations in mind, an analysis of the evidence will readily disclose whether or not the trial court was right in the course taken.

When a child, plaintiff lived in Green City, Missouri, but for sixteen years prior to the date of her wedding she had lived in Springfield, Illinois. The newly-married couple went to live in Tarkio. Defendant's home in that city not being fully in order, owing to repairs being made, they lived at the home of defendant's sister for about two weeks until his home was ready for their occupancy. He owned a farm a few miles out from Tarkio.

Plaintiff, as heretofore stated, was blind, and this must be considered in judging of her situation under the living conditions with

which she was surrounded, and the care and attention a loving husband, mindful of his duties, should have shown her. He knew she was blind long before any engagement or marriage was thought of between them. If her helpless condition on this account, after awhile grew irksome to defendant, it was a matter to be cheerfully endured and called for more patient attention and loving watch-care on his part than ever before. Not being able to see, she could not read, and when her household duties were performed, no more lonely and helpless situation for a bride newly moved into a strange home could be realized than to be alone in the house throughout the day when her husband was at the farm, and wholly unrelieved when he returned at eventide as silent and uncommunicative as when he left for his work. Taciturnity and indifference on the part of a husband under such circumstances were not merely breaches of good manners, they were a species of refined cruelty which in their mental effect would render her loneliness and gloom well-nigh unendurable and her plight almost desperate. In spite of her blindness, she was a good cook and a careful cleanly housekeeper. Her husband concedes this. At first they were happy, her husband was companionable and attentive and matters went along well. But unlucky ventures of the husband on the board of trade had their effect and he became morose, sullen, uncommunicative, speaking to his wife only when she spoke to him and endeavored to learn why he acted so. The first few weeks were filled with the excitement and confusion of getting the home arranged and in order, so that there was little time or opportunity to note unpleasant things. And yet throughout the summer there was a great deal of unhappiness, unrest and confusion, but it was not until about the first of September, 1930, that plaintiff first became "aware of the fact that he (her husband) was displeased with me and didn't want me." She said that he finally "told me frankly that I wasn't the kind of a wife that he wanted. He said I didn't cooperate." It is not clear what he meant by that. Plaintiff says she gave him no excuse to talk that way and tried to ascertain a definite reason therefor, but could not get him to give it or to reason definitely. When she asked him why she "wasn't the sort of wife he wanted," he said, "after a good deal of hemming and hawing and so forth, that she didn't 'cooperate,' she was not 'considerate' and said many hard cutting things to her." The fact that plaintiff wasn't wanted was a "pretty hard blow" to her, it preyed on her mind and worried her a great deal because she "wanted to do her duty" and "do the right thing" and so she asked him why she wasn't pleasing him and why she wasn't the right sort he wanted, that she was willing to change her ways and do the things he wanted her to do. One evening after they had had that discussion he said to her, "Well, there are two kinds of women,

one type you think, 'God bless her, how can I keep her?' The other type you think, 'God damn her, how can I get rid of her?' Now, think that over.'' Defendant admits that this was said to her or in her presence, but he says it was told as a mere story he had read of what a man said, but that it was not said or told with any reference to her personally. His explanation of how or why he told her this "story" is not very satisfactory or clear.

Later on, they were having another talk "about not going on the way we are going" and defendant said to her, "We are getting very, very poor" and asked what she would take to leave him, would she take a $1000? Plaintiff told him she didn't want to leave, that she thought they "ought to work this thing out" and she argued along that line, but he said, "We are not getting on. What I wanted was a wife. If you will leave me, I will give you a thousand dollars, two hundred dollars the day you go, and eight hundred dollars the day you are no longer my wife."

Plaintiff said to him, "Bill, do you really not want me here?" He replied, "So far as you are concerned, no, if you can't come up to my standard of living, I think you had just as well go upstairs and pack up."

Plaintiff thought she had to go; she didn't know what else to do. She went upstairs and began to pack up her personal things, she thought she had to go. The next morning about daybreak he got up and began bringing in boxes and packing up things. Plaintiff was hoping he would ask her to stay, and spent the night wondering what she was going to do, and finally asked him "what he was bringing those things in for." He replied, "We are going to pack up your belongings. I am going to get rid of you as cheaply as possible." She told him she had no trunk and he said he would get one. She told him she didn't know where to go, and that it seemed a pretty cold proposition to send her out in the world with a couple of hundred dollars; she didn't know where she could go or what she could do, and felt quite humiliated. He said she could go to St. Louis and get a job and work like he worked; that there was always a job, and the lecture platform would be fine for her. By now plaintiff had become so ill that she could not finish packing and told her husband she "she just wasn't able to travel alone" and could not take the afternoon train, and didn't go.

About September 28, defendant again requested her to leave his home. He told her he would get her a ticket and send her home and she told him she didn't want to go home, "didn't feel like I could go home. My mother was old and it would worry her, if he didn't want me there I would go to St. Louis among my friends, and seek advice what to do." He said he could give me fifty dollars to go on. I said, "Are you going to give me the two hundred? I can't stay

in a big city alone and no money." And he said he would give me fifty dollars which he did. Thereupon her husband took her to Maryville where this blind bride of a summer boarded the night train for St. Louis, and her gallant husband coldly saw her start bravely forth in her blind and helpless state, clutching to her bosom his munificent endowment of fifty dollars.

Plaintiff went to St. Louis and later went on to Springfield but on October 13, she telephoned her husband telling him she would like to come back. She did go back. Her husband met her at the train, and for the first few days he treated her, as she says, "lovely, and I thought we were going to get on and make it all right, and everything was going to be all right," but about the third day defendant went to the farm "and he came in as black as night and I couldn't get anything out of him, and he wouldn't talk. I didn't know what had gone wrong. I tried to talk, it didn't seem to get any results." The next day there wasn't any conversation, and she wondered why he wouldn't talk to her and that kept up for ten days. She finally asked him why he wouldn't talk to her. He replied that so far as he could see they had nothing in common to talk about, that they lived in different worlds.

Plaintiff took care of the house except that once a week she had a neighbor lady to come in and clean up especially where there were cobwebs and insects requiring sight to do it properly. She paid for this herself out of a small sum of money she brought with her from Springfield. Her husband during their married life gave her three checks of $5 each, but after a purchase of wheat on the board of trade in August, 1930, became very irritable about money matters.

Upon plaintiff's return to their home from Springfield it was the husband's birthday and plaintiff says she was "awful happy to get back," and thinking it would perhaps make him happy, she had this neighbor to make a birthday cake, and plaintiff had a birthday dinner for him.

As a result of defendant's silence and taciturnity, plaintiff "set around alone." At times he would leave the room, go into the next room and shut the door. She said, "I have known him to cover himself for week after week long, and I would hardly get a word out of him. I was strange in Tarkio and this naturally made me very nervous, because I would be at home during the day, and I was mindful of the fact that he had had his day and would be weary when he came in, and I just felt like we ought to spend our evenings conversing and he would lie and rest, and it became very wearying and nervewrecking on me to be alone all day and then have my evening quiet too. The thing that made me most nervous, affected me the worst, was the fact that I was a disappointment, and that he

didn't want me and that he didn't care to have me around and that just about broke me up.''

On November 14, 1930, defendant told plaintiff she wasn't the kind of a wife he wanted, and said many other things to her that she says she is afraid she will never forget. He told her that so far as he was concerned, he was through with her forever. He was going to get rid of her as cheaply as possible. He also said ''so far as I am concerned we just as well get out of our misery. You can make your own plans. You can go home if you like. This time you are not going on my money, and this time you can just make your own plans. I am through.''

Plaintiff testified that she didn't know what to do. The next morning she telephoned the hotel, reserved a room and telephoned her family to send after her, she had to come home, and her brother came and got her. From the 15th of November up to the time he came, she stayed with Mrs. Travis, defendant's married sister.

On cross-examination, plaintiff testified that it was not a matter of making up her mind not to live with her husband. ''I wasn't wanted there. There wasn't but one thing to do, and he told me to go, told me he was through forever.'' . . . ''He didn't want me there. I didn't see that I could stay longer.''

Plaintiff further testified that during the existence of the marriage she was kind to and considerate of her husband, gave to him and his home the very best she had to give and treated him with kindness and affection and that after the final separation on November 15, defendant did not communicate with her in any manner whatever.

There was evidence on the part of her brother, president of the Abraham Lincoln Life Insurance Company of Springfield, Illinois, that he came to Tarkio and to defendant's home and told him he had come to pack up plaintiff's things, whereupon defendant helped him get boxes and helped him to pack, but did not discuss the separation nor the fact of plaintiff's leaving nor did he ask plaintiff to remain.

Mrs. Admire, the kindly neighbor who worked cleaning the house once or twice a week, testified that plaintiff was a nice housekeeper, and an industrious woman and did the best she could.

There was also evidence that plaintiff's general reputation for being an even-tempered woman was good. On behalf of defendant, a sister, Mrs. Travis, testified that on November 15th, plaintiff asked her over the telephone to come to her home and she did. She had a lot of things packed up and witness asked her what was the trouble and she said she was going; that witness told her she did not think she had better go to the hotel but that she had better go home with her. In the course of her testimony she says that the husband came

home while they were at work packing and she asked the husband, "what about this, Will?" And he said "I do not want her to go but I can't make her stay. But he took her bags, put them in his car, and took them and his wife to his sister's home. She made no complaint during the days plaintiff stayed at her house about her husband's treatment of her.

The record of Mrs. Travis' evidence discloses that during the time plaintiff was packing up and getting ready to leave, defendant did nothing more than to perfunctorily tell plaintiff he didn't want her to go and then turned to witness and said, "I can't make her stay." Though he himself says that at one time he put his arms about her in his effort to get her to stay.

Defendant denies that he ever said the things to her she says he said, about not wanting her to stay, telling her to go and that he was "through." He also denies that he ever offered her $1000 to leave or that he was going to get rid of her as cheaply as he could, etc.

He admits, however, that at the time she left for St. Louis, he took her in his car to Maryville where she boarded the train for that city. He says she was gone about two weeks and then telephoned him in reference to coming back home; he says she did not ask to come home but told him she was coming and asked him to meet her at Maryville; that when he came home on November 15th and found her and his sister, Mrs. Travis, packing her effects, and her things partly packed, all he said to her was, "I don't want you to go, Lenah," several times. The whole recital is given in a cool, uninterested matter-of-fact way, and is not at all what a well-meaning right-minded husband would do or say if distressed at the situation, or at all anxious to have his wife stay and resume her status as his wife.

On cross-examination he was asked about taking his wife to Maryville to go to St. Louis, as follows:

"Q. You didn't care, did you, how long that fifty dollars lasted that girl in St. Louis, helpless as she was? A. God only knows I didn't. Anyway she went."

In reference to his remarks to her at the time she was packing to leave, made to induce her to stay, he was asked:

"Q. Did you use cold approaches to your wife to induce her to stay merely consisting of such remarks, 'I don't want you to go,' things like that? A. Assuredly *so. Not a great deal more.*

He denied saying to her, she was not the kind of a wife he wanted, nor that he was tired of making efforts for her or that he was going to get "rid of her as cheaply as he could or that he and she might as well get through with this misery." He admits, however, that he did tell her he would not give her any money the last time she left.

Defendant introduced in evidence some letters written by plaintiff, among them one to Mrs. Travis, her sister-in-law, whom she calls "Min" and one to her husband; but so far from disclosing that she had no grounds for divorce, they are not to be interpreted as admitting herself to be wholly to blame or entirely in the wrong, they seem to be rather the letters of a woman anxious to be on good terms with her husband and to endeavor to resume happy marital relations again. Her so-called admissions of wrong on her part are nothing more than a willingness to share a part of the blame for the situation that has come about, in the hope that this attitude will succeed better than if she charged him with all of it.

It is not the calm cold utterances of a wife that cares nothing for her husband or that cooly and heartlessly leaves him, but, reading between the lines, can be seen the willingness to take blame on herself rather than make a cruel accusation against him. For instance, in her letter to Mrs. Travis, written from Springfield, September 30th, after she had gone there, as she says, because he told her to leave, and after, as he says, she had telephoned him she was coming back, she wrote:

"Springfield, Ill.
"Tuesday.

"Dear Min:

"Possibly you will not forgive me . . . I hope you will. I wanted to come to see you but Bill would not permit me to do so. Min, as a mother, a sister and friend . . . you have been all that to me and as such, won't you help? Help to keep this from being a final break between Bill and me. I did not leave angry, dear, but I was heart sick . . . homesick and I did not thoroughly realize what was wrong but Min, I can't be expected to grow away from Springfield all at once I will have to do it gradually and you realize, I am sure that there have been many problems for me as well as many for poor Bill. Min, I love Bill with all my heart and I can't be happy without him, and surely now that we have started, we can't let this thing fall through like this, but the mice are getting bad and they just frighten me so and make me so nervous and I cry and Bill doesn't seem to understand as they do not frighten him and I realize that perhaps I was irritable and nervous and I think had I come home sooner, things would have been different.

"I called Bill last night and could hear him so well and the sound of his voice made me desperate because the thought of his being there alone . . . . but maybe he prefers it to me. Min, I feel like Bill is through but won't you talk to him and try to help him to understand that the first year there is always such a big adjustment on both sides, and that it was hard for me leaving all and never being accustomed to a house, it was hard for me, but Min, I believe

I did try to establish a proper home for Bill and our heavenly Father only knows that I wanted to make him comfortable and happy but I am afraid he feels I did not have my heart in it, but Min, surely I could not be expected to grow into it all at once. You realize that, don't you? I do want to try, Min, and I want to do my part and I want to make Bill happy if he cares. Will you see what you can do, dear, that is, if you feel I am deserving, and then, drop me a line? I am just sick over it all and I don't want to cause any one any trouble or grief and I would not hurt Bill for the world but I just could not help it because some things made me nervous but maybe time would take care of those things.

"My thought was interrupted but all that I am trying to say is this, I did become unhappy because I was homesick and the mice and wind and things annoyed me but I think Bill feels my attitude is not what it should be, but it takes time, doesn't it when one makes such a decided change in one's life? Min, you and your family and all Bill's family have been so wonderful to me and I do want to mean something to you and not be a worry to any of you and most of all to Bill, so won't you please, see what you can do? May I not have a line from you?

"With love,

Lenah."

"P. S. I never told any one there that I was leaving, so none need know but what I have gone on a visit. So far, I have not told my family anything only that I was homesick.

"If Bill is willing for us to try again, isn't there some way we can put on a crusade on those mice and get rid of them? Oh, Min, please help me . . . I don't see now how I can go on without Bill. I do love him so and he is so gentle and sweet and surely these annoyances can be worked out, that is, if he has not grown cold toward me. You will write me, won't you?

"With love to all,

"Lenah."

Plaintiff admitted readily on the stand that she wrote the above letter, but says that she did not write the Post Script. All of the letter, including the signatures, is in typewriting, so that it is not impossible for some one to have added that to her letter. On the other hand it is not impossible that she has forgotten writing that. The Post Script does not necessarily give the lie to all her testimony but appears more like the anguished and nearly hysterical outpourings of a woman anxious to regain her husband's love. In that situation she could easily shower upon him the endearing terms therein, notwithstanding the fact that he had heartlessly told her to go. Remember, this was the *first* time she had had to go, and at that time absence and distance would make the heart grow fonder and

cast a rosy-colored atmosphere over his excellencies and virtues which would be allowed full sway as she pleaded for home and sweetheart.

She says in the letter she *never told anyone she was leaving*—i. e., leaving finally. Of course, she didn't, and gives that as a reason why their relations can be easily resumed without embarrassment from what the neighbors and others might say and think. Another letter written about the same time, before she returned, but bearing no date, and, like the other, wholly in typewriting, shows a heart and mind willing to do almost anything to become reconciled, but in no way proving that her testimony in court was false. To a chancellor, wise in the knowledge of human nature, this letter, typewritten by a blind woman groping in the dark for her mate, when compared with the calm, unruffled behavior of her husband, when confronted with the departure of his mate, and enduring without disturbance her continued absence, is not a document likely to incline the judicial ear favorably to his side of the controversy. Here it is:

"Springfield, Ill.

"Dearest Bill:

"Maybe you don't want this but I have to write it. Now I am here and you there at the end of four months. You feel my attitude was not right . . . that my heart was not in it. Bill, did you expect to make me a moddle wife in four months . . . a girl coming out of an office, ignorant of a house and all that goes with it. Do you think I could all at once give up family and all the love and gayety and make the break so suddenly and not feel it? Bill, I was trying to do it but I had stayed away from home too long. Had I come home sooner, it would have been better. I was ill with home-sickness.

"So far as I am concerned, no one there knows I came and so far, I have not told my family anything.

"Bill, I made you unhappy . . . you thought I didn't want to help you but I do. After our little home is in running order, we should be able to move along, but it has been a struggle and both you and I went under through the pressure. Now Bill, at the end of four months, are we defeated? Are you through? Do you want to go on alone or at least, . . . shut me out?

"You don't believe me but I do love you and I want to be what a wife should be to you but it has meant growth for me. I was an ignorant office girl and did not know what married life involved and surely you could not expect me to be a moddle in four months. I have made a gross failure and I felt you growing cold toward me and that too did not add to my happiness. Bill, I should have grown gradually away from home and not tried to endure the change for such a long period of time and in that way, I could have developed into the change more gradually.

"I am not going to beg you to take me back Bill, but I want you to think over this and try to see my side of it and whether you believe it or not, Bill, try to know and believe that I love you and want you more than all else in the world and I want to try to do my part and make you happy but if you feel I can't make you happy and that you are through, please just drop me a casual line enough to let me know that I· am forever out of the picture. I don't know what life will mean to me without you, Bill . . . very little, I am afraid.

"Surely we could put a crusade on the mice and get rid of them. I just could not help it making me nervous. Surely Bill, there is a way to meet these problems and after we have taken our vow, surely we should try to work it out and make a go of it instead of ˙breaking up our home like this. I was homesick Bill, and I suppose it made me irritable but try to believe that my heart is right and that I am sincere in my love for you. I don't know of anything more I can say. Have you any message for me? May I not have a line and, oh, dear Bill don't shut me out.

"With all my love,

"Your Lenah."

Another letter, likewise having no date, but doubtless written after the first anniversary of their wedding, is not so lovingly hysterical and perhaps is tempered by caution through her experience; but it is not the callous-hearted missive of a wife who is unrelenting and will not forgive, reads thus:

"Friday, Springfield, Ill.

"Dear Bill:

"We have crossed the threshold of another year. No doubt, both of us have learned much in the year past. We have known what it is to have each other, and we now know what life is without each other.

"In your letter, you expressed a desire for me to come back. If you wish to talk things over Bill, and if I mean any happiness to you, come over and we will see how we feel after we have visited and reconsidered everything.

"I should think you could drive it in a day. Let me know.

"Lovingly, your wife,

"Lenah."

It is urged that if any offense was committed by defendant, of sufficient importance to be ground for divorce, it was condoned by plaintiff's return to and living with her husband; but clearly such is not the rule. A condonation is conditioned upon future good behavior on the part of the offender, and a repetition of the offense or offenses, not only is an aggravation thereof, but revives the right to

make them all grounds for divorce. [Guthrie v. Guthrie, 26 Mo. App. 566; Viertel v. Viertel, 123 Mo. App. 63, 64.]

There was no reversible error in the exclusion of defendant's Exhibits G and H. The former is the last letter hereinabove quoted, so that it has been considered in evidence here; but is not considered of sufficient weight or force to justify reversing the judgment. Likewise the evidence as to what these two people said to each other during their courtship has no weight or force in the determination of the issues now before us. We may properly consider all the evidence offered, as being before us. [Holschback v. Holschback, 184 S. W. 155, 157; O'Neil v. O'Neil, 264 S. W. 61, 64.]

Lastly it is said that plaintiff's evidence is uncorroborated, and a divorce will not be granted on the uncorroborated evidence of the complainant alone. The rule, however, is not generally deemed inflexible, even if it could be charged against the evidence in the case bar. [19 C. J., sec. 348, p. 133.] We think her evidence was amply corroborated. [O'Hern v. O'Hern, 206 Mo. App. 651, 659, 660; Wheat v. Wheat, 279 S. W. 755, 760.]

Having carefully studied the evidence in all its bearings to see that nothing herein exists in the way of a smart designing woman attempting to overreach an honest, well-meaning, but outraged man. Being satisfied, however, that the trial judge took a wise and entirely correct view of the evidence, we must affirm the judgment. It is so ordered. All concur.